# IN THE SUPREME COURT OF THE STATE OF IDAHO
## Docket No. 34430

RODNEY GRIFFITH and CARLA GRIFFITH, husband and wife, individually and dba, BOSWELL FARMS,

    Plaintiffs-Appellants-Cross Respondents,

v.

CLEAR LAKES TROUT CO., INC., an Idaho corporation,

    Defendant-Respondent-Cross Appellants.

--------------------------------------------------------

CLEAR LAKES TROUT CO., INC., an Idaho corporation,

    Counterclaimant-Respondent-
    Cross Appellants,

v.

RODNEY GRIFFITH and CARLA GRIFFITH, husband and wife, individually and dba BOSWELL FARMS,

    Counterdefendants-Appellants-Cross Respondents.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Twin Falls, November 2008

2009 Opinion No. 13

Filed: January 27, 2009

Stephen W. Kenyon, Clerk

---

Appeal from the District Court of the Fifth Judicial District, State of Idaho, Twin Falls County. Hon. G. Richard Bevan, District Judge.

District court decision awarding damages and attorney fees, <u>vacated and remanded.</u>

Jeffrey J. Hepworth & Associates, Twin Falls, for appellants. Jeffrey James Hepworth argued.

Worst, Fitzgerald & Stover, Twin Falls, for appellants.

Ringert Law, Boise, for respondents. James G. Reid argued.

---

1

BURDICK, Justice

This is the second appeal of a commercial sales contract dispute between Appellants/Cross-Respondents Rodney and Carla Griffith, individually and d/b/a Boswell Farms (collectively the Griffiths), and Respondent/Cross-Appellant Clear Lakes Trout Co., Inc. (Clear Lakes). At issue is whether the district court's award of damages to the Griffiths for contract years six and seven is sufficient, and whether the district court properly awarded attorney fees to the Griffiths after remand pursuant to their twenty-five percent (25%) contingency fee agreement. We vacate the district court's award of damages and remand with instructions for the district court to clarify whether it took mortality loss into consideration. We also hold the district court did not abuse its discretion in awarding the Griffiths attorney fees pursuant to their contingency fee agreement, but vacate the district court's award of attorney fees and remand subject to the district court's clarification of damages. We award the Griffiths attorney fees and costs on appeal.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In September 1998, Clear Lakes, which operates a fish hatchery, executed a six-year contract with the Griffiths, trout growers, under which Clear Lakes agreed to sell the Griffiths sufficient quantities of small trout to enable the Griffiths to grow "up to two million pounds live weight" each year, which then the Griffiths agreed to sell back to Clear Lakes once the trout grew to "market size." The parties performed satisfactorily under the agreement for the first three years; however, after September 11, 2001, the market for trout changed significantly as Clear Lakes's customers began to demand larger fish. As Clear Lakes's resale market began to dry up, it started taking trout deliveries from the Griffiths much later and in smaller loads, leaving the Griffiths with overcrowded ponds and a tightened cash flow.

By 2002, the Griffiths were experiencing financial difficulty due to the slowdown in volume. Clear Lakes promised to work better with the Griffiths in the future, and also agreed to extend the terms of the contract for one year to 2005. However, the contract was terminated near the end of the fifth year in August 2003.

In September 2003, the Griffiths filed suit, alleging Clear Lakes had breached the contract by refusing to accept and purchase back in a timely manner the trout that the Griffiths had grown to market size. The district court agreed with the Griffiths and found that Clear Lakes was in breach of the parties' output contract. The district court awarded the Griffiths

$446,099.80 for increased costs and lost profits from years four and five of the contract; however, the court refused to grant lost profits for the remaining years six and seven, finding that the potential for raising additional fish was too speculative to support an award of damages.

As the prevailing party to a commercial contract dispute under I.C. § 12-120(3), the Griffiths were entitled to attorney fees. Despite the fact that the Griffiths had executed a 25% contingency fee agreement with their attorneys before trial, the Griffiths sought attorney fees based on an hourly rate. The district court granted the Griffiths' request and awarded the Griffiths $98,792.00 in hourly fees.

In *Griffith v. Clear Lakes Trout Co., Inc. (Griffith I)*, 143 Idaho 733, 152 P.3d 604 (2007), the Griffiths cross-appealed from the district court's denial of damages for contract years six and seven. This Court held that although damages would be difficult to ascertain, the Griffiths were entitled to damages for the remaining two years of the contract. As such, the court remanded the case to the district court with instructions to calculate damages for contract years six and seven. This Court awarded the Griffiths, as the prevailing party on appeal, attorney fees pursuant to I.C. § 12-120(3). Once again, the Griffiths sought attorney fees on an hourly basis and the district court awarded them $15,000.00 in attorney fees for the first appeal.

On remand, the district court relied upon the evidence presented at trial regarding damages for years six and seven. Rather than using the Griffiths' output figures from years two and three of the contract as the Griffiths requested, the district court used the Griffiths' average output from years four and five to determine what the Griffiths' output would have been during years six and seven had the contract been carried out in its entirety. Although the district court considered the fact that Clear Lakes's breach had decreased the Griffiths' production during years four and five, the court did not specifically state in its opinion if those numbers were used in its calculation of damages. Based on the court's calculation table, it determined that the Griffiths were entitled to an additional $266,294.24 in damages for contract years six and seven.

As the prevailing party on remand, the Griffiths sought attorney fees. However, this time the Griffiths requested attorney fees pursuant to their 25% contingency fee agreement. Even though the Griffiths' attorneys had spent thirty-eight additional hours on remand, amounting to $7,386.50 in hourly fees, the Griffiths sought an award of $66,573.56. The district court noted that it could only speculate as to why the Griffiths sought attorney fees on an hourly basis for their previous two requests, but that after considering the total number of hours and years it took

3

the Griffiths' attorneys to try the entire case, an award based on the Griffiths' contingency fee agreement was reasonable. As such, the district court awarded the Griffiths' $66,573.00 in attorney fees after remand.

The Griffiths appeal the amount of damages awarded to them by the district court for contract years six and seven, arguing their average output figure from years two and three, rather than years four and five, was the proper measure of damage. Clear Lakes cross-appeals, arguing the district court erred in awarding the Griffiths attorney fees after remand pursuant to their contingency fee agreement, rather than on an hourly basis. Both parties seek attorney fees on appeal.

## II. DISCUSSION

### A. Damages for contract years six and seven

#### 1. Standard of Review

"A district court's award of damages will be upheld on appeal where there is sufficient evidence supporting the award." *Griffith I*, 143 Idaho 733, 740, 152 P.3d 604, 611 (2007) (quoting *Sells v. Robinson,* 141 Idaho 767, 774, 118 P.3d 99, 106 (2005)). This Court has held that evidence is sufficient if it proves the damages with reasonable certainty. *Griffith I,* 143 Idaho at 740, 152 P.3d at 611. "Reasonable certainty requires neither absolute assurance nor mathematical exactitude; rather, the evidence need only be sufficient to remove the existence of damages from the realm of speculation." *Id.* Ultimately however, it is for the trier of fact to fix the amount after determining the credibility of the witnesses, resolving conflicts in the evidence, and drawing reasonable inferences therefrom. *See id.*

#### 2. Clear Lakes's failure to contest the district court's conclusion that the parties entered into an output contract does not prevent this Court from considering whether the parties entered into an output contract on appeal.

First, the Griffiths argue the district court's ruling that the parties entered into an output contract is binding. After trial, the district court concluded, as a matter of law, that the parties entered into an output contract. Although Clear Lakes initially disputed that the agreement was an output contract at the trial court level, it failed to challenge the district court's ruling on either appeal. As such, the Griffiths argue that the district court's ruling is final and cannot be considered by this Court on appeal. We disagree.

Pursuant to Idaho Appellate Rule 35(a)(4), an issue that neither party has raised or argued in their briefs will generally not be considered on appeal. *See also Rhead v. Hartford Ins. Co. of*

*the Midwest,* 135 Idaho 446, 452, 19 P.3d 760, 766 (2001); *Hei v. Holzer*, 139 Idaho 81, 86, 73 P.3d 94, 99 (2003). However, I.A.R. 35(a)(4) also provides that an appellant's statement of the issues "will be deemed to include every subsidiary issue fairly comprised therein." I.A.R. 35(a)(4). Here, the Griffiths assert that one of the issues surrounding contract damages is whether the district court erred as a matter of law in reducing the Griffiths' output based on Clear Lakes's market decline.[1] In order to address this issue, we must first determine what type of contract is involved. For example, Clear Lakes's market decline would be irrelevant to the district court's determination of damages if the agreement were strictly an output contract, whereas the market decline would be a relevant consideration in an output/requirements contract.[2] Therefore, we conclude that whether an output contract is involved to be a subsidiary issue in the case. *See* I.A.R. 35(a)(4).

3. This Court did not state that the parties entered into an output contract in *Griffith I.*

In addition, the Griffiths argue that this Court already acknowledged that the parties entered into an output contract on the first appeal and, therefore, the issue has been resolved and cannot be contested on the second appeal. However, in *Griffith I*, this Court merely addressed the Griffiths' argument that the contract's quantity was certain as a matter of law because it was an output contract. 143 Idaho at 743, 152 P.3d at 614. Although we went on to reverse the district court on the issue of contract damages for years six and seven, this Court did not provide a definitive reason for doing so. Specifically, this Court stated: "While damages may be difficult to determine it is clear that the Clear Lakes breach deprived Griffith of the opportunity to complete performance of the contract for the remaining years and that losses for those years occurred." *Id.* Thus, we never held that the parties entered into an output contract in *Griffith I*.

4. The district court erred in concluding as a matter of law that the parties entered into an output contract.

After trial, the district court concluded as a matter of law that the parties entered into an output contract. In an output contract, the seller determines quantity. I.C. § 28-2-306(1); 77A

---

[1] Specifically, the Griffiths summarized the issue regarding contract damages for years six and seven as follows: "Griffith contends the trial court erred as a matter of law when it determined Griffith's 'output.'" This issue statement is broken down into two subissue statements, which are: 1) "The court should not have reduced Griffith' [sic] output because Clear Lakes's market to sell fish declined[,] and 2) "The court should not rely on Griffith's output in years where Griffith's output was reduced due to Clear Lakes's breach of contract."

[2] *See infra* Part II.A.4, 6.

C.J.S. *Sales* § 306 (2008). Yet, the district court also concluded that Clear Lakes, the buyer to the contract, was the party who determined quantity. Specifically, the district court stated:

> Clear Lakes argues that the agreement is not an output contract because Clear Lakes controlled the amount of fingerlings sold to the Griffiths. Nevertheless, the agreement required Clear Lakes to purchase all of the Griffiths' output, up to two million pounds of trout. *As the "party who will determine quantity," Clear Lakes is bound to exercise good faith in managing the output contract.*

(Emphasis added.) The district court quoted language from comment 2 to section 2-306 of the Uniform Commercial Code, which states:

> Under this Article, a contract for output or requirements is not too indefinite since it is held to mean the actual good faith output or requirements of the particular party. Nor does such a contract lack mutuality of obligation since, under this section, *the party who will determine quantity* is required to operate his plant or conduct his business in good faith and according to commercial standards of fair dealing in the trade so that his output or requirements will approximate a reasonably foreseeable figure.

(Emphasis added.)

When reviewing a trial court's decision after a bench trial, our review is limited to ascertaining "whether the evidence supports the findings of fact, and whether the findings of fact support the conclusions of law." *Griffith I*, 143 Idaho at 737, 152 P.3d at 608 (quoting *Idaho Forest Indus., Inc. v. Hayden Lake Watershed Imp. Dist.,* 135 Idaho 316, 319, 17 P.3d 260, 263 (2000)). "[I]f the findings of fact are supported by substantial and competent evidence, even if the evidence is conflicting, this Court will not disturb those findings." *Griffith I,* 143 Idaho at 737, 152 P.3d at 608. Conclusions of law, however, are reviewed under a different standard. *Id.* "[T]his Court is not bound by the legal conclusions of the trial court, but may draw its own conclusions from the facts presented." *Id.*

The entirety of comment 2 to U.C.C. § 2-306 clarifies that the drafters did not mean to imply that either party to an output contract could determine quantity when they said "the party who will determine quantity." The drafters merely chose this language for the sake of simplicity. Rather than saying "the seller in an output contract and the buyer in a requirements contract," the drafters decided to refer to both parties through a single phrase as "the party who will determine quantity." Thus, contrary to the district court's conclusion, the buyer to an output contract cannot determine quantity.

6

What the district court really determined was that the parties entered into an output/requirements contract,[3] i.e., an output contract subject to the buyer's requirements.[4] Here, the parties agreed that Clear Lakes would sell the Griffiths sufficient quantities of small trout to enable the Griffiths to grow up to two million pounds of market size trout per year, and Clear Lakes would repurchase the trout once they reached market size. The whole purpose of this arrangement was for the Griffiths to profit from raising the trout to market size, and for Clear Lakes to profit from reselling the market size trout. Since Clear Lakes controlled the Griffiths' production, it reasonably follows that it would not have sold more small trout to the Griffiths than it thought it could later resell once the fish reached market size. Otherwise, from an economic standpoint, it would make no sense for Clear Lakes to enter into such an agreement. As such, the quantity of fish under the agreement was not only subject to the Griffiths' good faith output of market size trout, up to the stated maximum of two million pounds, but was also subject to Clear Lakes's good faith requirements for trout in its resale market. Therefore, we hold that the parties entered into an output/requirements contract.

5. The contract does not contain a stated estimate of "two million pounds."

The Griffiths assert that the contract has a stated estimate of "two million pounds" of trout per year. As such, the Griffiths argue that 1,390,454 pounds of fish, which was the quantity the district court used to measure the Griffiths' prior output, is unreasonably disproportionate to the contract's stated estimate of two million pounds of fish. Although the Griffiths argue the contract language estimates the Griffiths' output at "two million pounds," the full language of the contract states that Clear Lakes was to provide enough fingerlings to the Griffiths to enable them to grow "*up to* two million pounds live weight for each year under the agreement." (Emphasis added). Based on this language, the district court found that Clear Lakes was not contractually obligated to deliver enough small trout to equal at least two million pounds of market size trout.

Idaho Code § 28-2-306(1), which governs output contracts, states in pertinent part:

A term which measures the quantity by the output of the seller . . . means such actual output . . . as may occur in good faith, except that no quantity unreasonably

---

[3] Other courts have recognized that parties may enter into a contract that falls within the definitions of both an output and a requirements contract under U.C.C. § 2-306. James Lockhart, *Quantity Measured by Output or Production*, 94 A.L.R. 5th 247, 329 (2001); *see also Northern Nat. Gas Co. v. Conoco, Inc.*, 986 S.W.2d 603 (Tex. 1998).

[4] By using the phrase "buyer's requirements," we are referring to the requirements of a buyer to an output contract.

7

disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output . . . may be tendered or demanded.

Comment 3 to I.C. § 28-2-306 goes on to state:

If an estimate of output or requirements is included in the agreement, no quantity unreasonably disproportionate to it may be tendered or demanded. Any minimum or maximum set by the agreement shows a clear limit on the intended elasticity. In similar fashion, the agreed estimate is to be regarded as a center around which the parties intend the variation to occur.

Upon reading I.C. § 28-2-306(1) in conjunction with comment 3, it is clear that a stated estimate is treated differently than a stated maximum in determining damages for an output contract. A stated maximum sets an upper limit on what the parties intend the elasticity of the seller's output to be, whereas a stated estimate is the basis from which contract damages are to be centered around. Here, the two million pound provision was prefaced by the words "up to." Thus, two million pounds merely serves as a maximum amount of trout that Clear Lakes was obligated to purchase under the agreement, rather than, as the Griffiths argue, the center from which the parties intended output variation to occur. As such, we hold that there is no stated estimate in the contract.

6. <u>Clear Lakes's market decline during years four and five of the contract was relevant to the district court's determination of damages for years six and seven.</u>

The Griffiths also argue that Clear Lakes's requirements from years four and five of the contract were irrelevant to the district court's determination of damages for years six and seven. If the parties' agreement was merely an output contract, then the Griffiths would be correct. In an output contract, the quantity of goods to be delivered under the contract is governed by the seller's good faith output. I.C. § 28-2-306(1); 77A C.J.S. *Sales* § 306 (2008). However, as set forth above, this agreement was an output contract subject to the buyer's requirements. Courts recognizing output/requirements contracts have found that parties to such contracts undertake the risk that their counterparts to the contract may make good faith variations. *See* James Lockhart, *Quantity Measured by Output or Production* 94 A.L.R. 5th 247, 329 (2001). As the Texas Supreme Court explained in *Northern Natural Gas Co. v. Conoco, Inc.*:

Nothing requires the seller in an output contract to have any output, and nothing requires the buyer in a requirements contract to have requirements. On the other hand, parties to output/requirements contracts are required to exercise good faith in determining outputs or requirements, as well as accept the concomitant risk that

their counterparts to the contract may make good faith variations, even to the extent of liquidating or discontinuing the business.

986 S.W.2d 603, 608 (Tex. 1998). Here, Clear Lakes controlled the Griffiths' production; thus, by entering into the contract, the Griffiths undertook the risk that Clear Lakes could reduce the quantity of trout it sold to the Griffiths based on its good faith requirements for trout in the resale market. As such, the district court properly considered Clear Lakes's market decline in its determination of damages.

> 7. The district court properly exercised its discretion in using the Griffiths' average production figure from contract years four and five as the measure of damage for contract years six and seven; however, the district court failed to make findings from which we can evaluate whether it abused its discretion by not increasing the Griffiths' production figures from years four and five by the loss of fish attributable to Clear Lakes's breach.

Finally, the Griffiths assert their average production figure from years two and three of the contract—the years in which Clear Lakes was not in breach—was the proper measure of damage. During years two and three (from September 1999 through September 2001),[5] the Griffiths produced an estimated 1,870,577 pounds of trout per year. After September 11, 2001, however, the market for trout changed significantly as Clear Lakes's customers began to demand larger size fish. Once Clear Lakes's resale market began to dry up, it started decreasing the number of small trout it provided to the Griffiths. As a result, the Griffiths' average output declined to 1,390,454 pounds of fish per year over contract years four and five.

The district court exercised discretion in using the Griffiths' average production figure from contract years four and five as the measure of damage for years six and seven. Idaho Code § 28-2-306(1) sets forth that in the absence of a stated estimate, the quantity term for an output contract is to be measured by "any normal or otherwise comparable prior output." Here, contract years two and three were unaffected by the decline in Clear Lakes's resale market, which, as set forth above, was a relevant consideration to the district court's calculation of damages. Thus, the production figures from years four and five reflect a more comparable prior output to what the Griffiths' production would have been during years six and seven than years two and three had the contract been carried out in its entirety. Therefore, we hold that the district court did not err

---

[5] The Griffiths' expert was unable to produce a reliable cost estimate for the first year of the contract due to insufficient accounting records. *Griffith I*, 143 Idaho at 741, 152 P.3d at 612.

in utilizing the Griffiths' average output figure from years four and five as the proper measure of damage.

However, it is unclear whether the district court abused its discretion by failing to increase the Griffiths' production figures during years four and five by the loss of fish attributable to Clear Lakes's breach. In an output contract,[6] quantity is to be measured by "such actual output . . . as may occur in *good faith."* I.C. § 28-2-306(1) (emphasis added). After trial, the district court determined that notwithstanding Clear Lakes's breach, the Griffiths could have produced an additional 102,624 pounds of trout in year four and 65,924 pounds in year five, and awarded the Griffiths approximately $37,000.00 in lost profits for the increased mortality rates, which this Court affirmed in *Griffith I.* Yet, in its determination of damages for years six and seven, we cannot tell how the district court treated the loss of fish attributable to Clear Lakes's breach. The district court recognized the negative effects that the breach had on the Griffiths' production for years four and five, but also noted that the market had declined during those years.

Without more precise reasoning from the district court we are unable to evaluate whether the court abused its discretion. We recognize that the district court is not required to calculate damages with mathematical exactitude. However, the increased mortality rates from years four and five, when factored into the district court's damage calculation table, increase damages for years six and seven by roughly seven percent, amounting to over $20,000.000. Furthermore, these figures were known to the court since it had previously utilized the increased mortality rates to award lost profits for contract years four and five. As such, we remand the case to the district court for a clear explanation as to its treatment of the effects of Clear Lakes's breach during contract years four and five in its calculation of damages for years six and seven.

**B. The district court did not abuse its discretion in awarding the Griffiths attorney fees after remand pursuant to their 25% contingency fee agreement.**

On cross-appeal, Clear Lakes raises an issue of first impression. Clear Lakes argues the district court erred in computing the amount of attorney fees it awarded to the Griffiths after remand pursuant to their 25% contingency fee agreement, rather than computing fees on an

---

[6] After the district court considered Clear Lakes's requirements, it went on to measure the Griffiths' output for contract years six and seven. Because we are dealing strictly with output measurement from this point on, we turn

hourly basis as the Griffiths had requested and the court had awarded twice before. Clear Lakes argues 1) the district court's award of attorney fees resulted in a double recovery for the Griffiths since they were awarded fees after remand for work their attorneys had previously been compensated for after trial, and 2) it is inequitable to allow the Griffiths to switch their basis for computing attorney fees from an hourly rate to a percentage this late in the case.

A trial court's calculation of reasonable attorney fees is reviewed for abuse of discretion. *Lettunich v. Lettunich*, 145 Idaho 746, __, 185 P.3d 258, 261 (2008). The party opposing the award bears the burden of demonstrating that the trial court abused its discretion. *See id.* In determining whether the trial court abused its discretion, this Court considers "(1) whether the trial court correctly perceived the issue as one of discretion; (2) whether the trial court acted within the outer boundaries of its discretion and consistently with the legal standards applicable to the specific choices available to it; and (3) whether the trial court reached its decision by an exercise of reason." *Id.*

When awarding attorney fees, a district court must consider the applicable factors set forth in I.R.C.P. 54(e)(3), but may consider any other factor that the court deems appropriate. *Id.* at __, 185 P.2d at 261–62. "Rule 54(e)(3) does not require the district court to make specific findings in the record, only to consider the stated factors in determining the amount of the fees." *Id.* at __, 185 P.2d at 262 (quoting *Smith v. Milton,* 140 Idaho 893, 902, 104 P.3d 367, 376 (2004)). However, the court need not demonstrate how it employed any of those factors in reaching an award amount. *See id.*

Here, the district court did not abuse its discretion in awarding the Griffiths attorney fees pursuant to their 25% contingency fee agreement. The district court carefully considered each of the factors listed under I.R.C.P. 54(e)(3), and went on to make special findings demonstrating how it employed some of these factors in reaching its decision. It is clear that the district court recognized the issue as one of discretion, applied its discretion consistently with the legal standards applicable to the specific choices available to it, and reached its decision by an exercise of reason. As such, we find that the district court did not abuse its discretion.

Clear Lakes argues that it was error for the district court to consider attorney fees as a whole and instead the court should have compartmentalized the fees by the stage of the case in

---

to Idaho's statute governing output contracts. Our reliance on this statute is not meant to conflict with our holding

which they were incurred. However, we agree with the district court that it was reasonable under the circumstances to consider attorney fees as a whole. As the district court explained:

> [V]iewing the case as a whole, the final steps in this case were merely the capstone of years of effort on the Griffiths' part to redress their grievances. As such, the court will not view the hours expended after remand, or the latest amount recovered in a vacuum; rather, the court views the entire result obtained, and the hours required to do so. The entire case took 851 hours to prosecute, including filing a cross-appeal to establish an entitlement to additional damages for the final two years of the contract. As such, the court concludes that the additional $66,573.56 is reasonable and will, therefore, order that amount paid to the Griffiths.

As such, we will not disturb the court's decision to award attorney fees pursuant to the Griffiths' contingency fee agreement.

Clear Lakes also argues that it was inequitable for the district court to allow the Griffiths to switch their method of computing attorney fees from an hourly rate to a contingency fee basis this late in the case. Although I.C. § 12-120(3) produces a harsh result by burdening the losing party with the attorney fees awarded to the other side, the trial court acts as a safeguard to ensure that the fee amount is reasonable. The trial court, being familiar with all previous awards of fees in the case as well as the factors under I.R.C.P. 54(e)(3), is the best judge of determining whether to honor a party's request to switch the method of computing attorney fees later in the case. There will be times when a party switches the basis of his request for computing fees for the sole purpose of creating a windfall for himself. The trial court will be able to see through such deception and will reduce the party's request for fees accordingly. However, there will be other times when a switch still results in a reasonable fee amount. Such was the case with the Griffiths' request for attorney fees after remand. The district court recognized that the purpose of awarding attorney fees in certain circumstances is to make the prevailing party whole again and accordingly granted the Griffiths' request for attorney fees pursuant to their contingency fee agreement. We agree that it was reasonable under the circumstances of this case to award the Griffiths attorney fees after remand pursuant to their contingency fee agreement. Therefore , we will not disturb the district court's decision to grant the Griffiths' request despite the late switch regarding the method of computation.

---

that the agreement is an output/requirements contract.

Although we hold that the district court properly awarded attorney fees, we vacate the district court's award of attorney fees subject to the district court's clarification of damages. If the district court concludes that it failed to properly account for the effects of the increased mortality rates caused by Clear Lakes's breach, it must amend its award of damages. As a corollary, the district court should amend the award of attorney fees in light of its determination to award attorney fees consistent with the Griffith's contingency fee agreement. However, if the district court clarifies that its decision to award damages reflected its consideration of increased mortality rates caused by Clear Lakes's breach, it may simply reenter the previous judgment for damages and attorney fees.

### C. Attorney fees on appeal

Both the Griffiths and Clear Lakes assert that they are entitled to attorney fees pursuant to I.C. § 12-120(3). Based on the outcome of the issues presented on appeal, the Griffiths are the prevailing party in this matter. Therefore, we hold that the Griffiths are entitled to attorney fees on appeal under I.C. § 12-120(3).

### III. CONCLUSION

We vacate the district court's award of damages for contract years six and seven and remand with instructions for the district court to make a finding as outlined above. We also hold that the district court did not abuse its discretion in awarding attorney fees to the Griffiths after remand pursuant to their contingency fee agreement, but vacate the district court's award of attorney fees and remand subject to the court's clarification of damages. The Griffiths are awarded attorney fees and costs on appeal.

Justices J. JONES, HORTON and TROUT, PRO TEM, **CONCUR.**

W. JONES, J. dissenting in part.

I respectfully dissent only from that portion of the Court's Opinion affirming the award of attorney fees to Griffiths on a contingency fee basis on remand of *Griffith I*. Although there might be circumstances under which it would be appropriate for counsel to change the fee agreement from an hourly to contingency fee basis and therefore change the basis for an attorney fee claim to the court, in my opinion under the circumstances of this case the change defies logic and is totally unfair to Clear Lakes.

As recognized by the majority, at the conclusion of the trial in this case, the district court awarded Griffiths what it determined to be a reasonable attorney fee as the prevailing party at

trial. Presumably by awarding such fee, the court and the Griffiths were satisfied that the fee was reasonable and appropriate. The award was for $98,792.00 which was the full amount requested by Griffiths. The case was then appealed to this Court (*Griffith I*) and the case was then remanded to the district court for determination of additional damages incurred during the fifth and sixth years of the contract between the parties. Virtually all of the work establishing the claim for those additional damages had already been done by Griffiths' counsel, since such damages were claimed in the trial. The district court simply did not award those damages because it felt damages for those years was speculative. This Court disagreed and told the district court to determine the amount of damages for those years.

Very little remained to be done by Griffiths' counsel on remand. Indeed, the record reflects Griffiths' counsel spent only 38 hours additional work and the district court followed this Court's instruction and computed damages for years five and six and awarded an additional $266,294.24 for those years and then awarded the Griffiths an additional $66,573.56 in attorney fees based on a contingency fee agreement of 25 percent. In doing so, the district court granted Griffiths a double recovery of attorney fees since the court had already compensated Griffiths' counsel at the end of the trial for the same work used by the court in calculating the additional damages. Indeed, the court awarded Griffiths' counsel nearly two-thirds of the total amount awarded for the entire first trial for only 38 hours additional work on remand. Such a result is unconscionable. When the case was remanded for the additional calculation for years five and six, there really was no "contingency" left. Liability had been established and it was simply a matter of recalculation of damages by the court for years five and six based largely on the work that had already been done and paid for at the close of the first trial. Griffiths' counsel was at no risk or "contingency" on remand, which is the usual justification for contingency fees.

I can understand and agree with the reasoning of the majority that this Court should not compartmentalize sections of the case in awarding fees, but rather should look at the overall picture to determine whether a prevailing party has been fairly and reasonably compensated for attorney fees. In awarding the additional fees on remand, the district court states that "[V]iewing the case as a whole, the final steps in this case were merely the capstone of years of effort on the Griffiths' part to redress their grievances." That statement may be true, but it is equally true that the Griffiths requested what they represented to the district court to be a claim for reasonable fees at the close of the trial and the court awarded the full amount of those fees presumably

14

believing that it had awarded the Griffiths reasonable attorney fees making them "whole" up to that point in time. Under those circumstances, it seems outrageous to then tack on after remand additional fees of nearly two-thirds the amount of the original fees when virtually no new work was done and the court simply calculated additional damages based on work which had already been done and paid for at the end of the trial.

This case has now been remanded again for calculation of perhaps additional damages, still based on the record in existence at the end of the trial, and one can only imagine whether more attorney fees calculated on a "contingency" agreement will again be tacked on. Such a result seems patently unfair if not unconscionable.