**IN THE SUPREME COURT OF THE STATE OF IDAHO**
Docket No. 47201

| | | |
|---|---|---|
| **JULIE A. NEUSTADT,** | ) | |
| | ) | |
| **Plaintiff-Counterdefendant-** | ) | |
| **Appellant-Cross Respondent,** | ) | **Boise, June 2020 Term** |
| | ) | |
| **v.** | ) | **Opinion Filed: July 30, 2020** |
| | ) | |
| **MARK D. COLAFRANCESCHI,** | ) | **Melanie Gagnepain, Clerk** |
| | ) | |
| **Defendant-Counterclaimant-** | ) | |
| **Respondent-Cross Appellant.** | ) | |

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Valley County. Jason D. Scott, District Judge.

The decision of the district court is <u>affirmed</u>.

Ludwig Shoufler Miller Johnson LLP Boise, for appellant/cross-respondent. Scot M. Ludwig argued.

Mark D. Colafranceschi, respondent *pro se*. Mark D. Colafranceschi argued.

_____

STEGNER, Justice.

This appeal involves the enforceability of a premarital agreement between Julie Neustadt (Neustadt) and Mark Colafranceschi (Colafranceschi). Before the two were married, they entered into a premarital agreement that required Neustadt to obtain a two-million-dollar life insurance policy naming Colafranceschi as the beneficiary. The agreement required Neustadt to keep the policy in force after termination of the marriage. During the divorce proceedings, Neustadt challenged the enforceability of this provision, arguing that the insurance clause was void as against public policy to the extent it applied after divorce. The magistrate court agreed that the contractual provision was void as against public policy. However, on appeal, the district court reversed, concluding the insurance clause did not violate any public policy in Idaho.

Neustadt appeals, arguing that the district court erred in finding the insurance clause valid and enforceable because, following the parties' divorce, Colafranceschi had no insurable interest

in Neustadt's life. Appearing *pro se*, Colafranceschi contends that the insurance provision is valid and enforceable.

Colafranceschi also filed a cross-appeal, asserting error in (1) the magistrate court's denial of certain discovery requests, (2) the lower courts' failure to address his objection to Neustadt's motion in limine, and (3) the lower courts' findings that Colafranceschi failed to prove he was fraudulently induced to sign the premarital agreement to get him to return to the couple's marital home.

For the reasons outlined in this opinion, we affirm the district court's decision.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Neustadt and Colafranceschi were married on March 26, 2012. The couple had no children together, although both had children from previous relationships. Six days prior to the marriage, on March 20, 2012, the two signed a premarital agreement (the Premarital Agreement). Among other numerous provisions, the couple's Premarital Agreement included a provision regarding life insurance. Section 4.8 of the Premarital Agreement (the Insurance Clause) provides:

(a) Wife must apply for 30-year term life insurance in the minimum amount of $2,000,000 within 30 days of the Effective Date of this Agreement. When the policy is issued it must name Husband as the sole beneficiary.

(b) Wife must keep the policy in force after termination of the marriage unless Wife obtains a divorce from Husband under Idaho Code Section 32-603(1) through 32-603(7)[1].

During the marriage, the couple was principally supported by substantial sums of money Neustadt received from the Allan Neustadt Testamentary Trust (the Trust). Colafranceschi is a chiropractor; however, he earned little during the marriage.

In 2013, the Trust purchased a residence located on Osprey View Drive in McCall, Idaho (the Osprey house). Neustadt and Colafranceschi resided in the home following its purchase. Colafranceschi claims that prior to him signing the Premarital Agreement Neustadt promised him a community interest in any houses the couple purchased.

After four years of contentious marriage, Neustadt filed for a divorce on May 6, 2016. She later amended her petition to allege additional grounds for divorce, including extreme cruelty and

---

[1] According to the Insurance Clause, Neustadt would be relieved from her obligation to procure a life insurance policy for Colafranceschi's benefit if she were to seek a divorce on the grounds of adultery, extreme cruelty, willful desertion, willful neglect, habitual intemperance, conviction of a felony, or if her spouse became permanently insane. I.C. § 32-603(1)–(7).

2

habitual intemperance. In his response, Colafranceschi asserted a counterclaim that essentially claimed that the Premarital Agreement was invalid to the extent it provided that he was not entitled to spousal support, and that Neustadt had promised him a community interest in the Osprey house.

Neustadt moved for summary judgment on October 6, 2016. In its decision on summary judgment, the magistrate court ruled in favor of Neustadt on several issues, including that (1) the Premarital Agreement governed the division of property; (2) Colafranceschi and Neustadt kept their separate property as noted in the Premarital Agreement; (3) there was no community debt; and (4) Colafranceschi was not entitled to spousal support. However, the magistrate court reserved several issues for trial, including whether Colafranceschi had been fraudulently induced with regard to his interest in the Osprey house.[2]

On October 26, 2016, following the summary judgment decision, Neustadt filed a motion in limine, arguing that the Insurance Clause was void as against public policy and unenforceable as a matter of law. Neustadt reasoned that the Insurance Clause violated the requirement of Idaho Code section 41-1804 that a beneficiary of a personal insurance policy have an insurable interest in the individual insured.

Colafranceschi responded, arguing that the motion in limine was untimely and merely a second attempt at a summary judgment motion. Additionally, he contended that the Insurance Clause was valid under contract principles and that Neustadt should be held to her contractual agreement.

The magistrate court granted the motion in limine, and held as a matter of law that the Insurance Clause was void as against public policy. The magistrate court reasoned Colafranceschi "would have no insurable interest following divorce. [Colafranceschi] would have no interest in the life of [Neustadt] but would have a direct interest in her death. The insurance would be a mere wager." However, the magistrate court recognized that Colafranceschi might be able to prove at trial that he had an insurable interest in Neustadt's life that would survive divorce, and would reserve a final ruling until after trial.

Although both parties alleged extreme cruelty as a ground for divorce, the two subsequently withdrew those claims and stipulated to a divorce on the basis of irreconcilable differences. However, pursuant to the stipulation, if Colafranceschi were to succeed on appeal

---

[2] Neither party appealed from any decision made by the magistrate court on summary judgment.

regarding the validity of the Insurance Clause, both parties would then be entitled to pursue a divorce on the grounds of extreme cruelty.

A three-day bench trial began on November 14, 2016. A few weeks later, on December 8, 2016, the magistrate court entered its findings and conclusions. The magistrate court rejected Colafranceschi's fraudulent inducement claims, finding that Colafranceschi "failed to meet his burden of proof by clear and convincing evidence that he was fraudulently induced" regarding any interest in the Osprey house. Finally, the magistrate court found that Colafranceschi had no insurable interest in the life of Neustadt and entered a final decision that the Insurance Clause was void as against public policy.

On December 16, 2016, Neustadt sought attorney fees. The magistrate court awarded Neustadt $50,000 in attorney fees pursuant to language in the Premarital Agreement that allowed for an award of attorney fees in an action regarding the Premarital Agreement.

Colafranceschi appealed from various magistrate court decisions to the district court. Colafranceschi listed numerous issues for appeal, many of which were confusing and unclear. On May 28, 2019, the district court entered an opinion regarding Colafranceschi's appeal; however, the district court later entered an amended opinion on July 8, 2019.[3] Among its decisions, the district court held that the insurance clause was not void as against public policy. The district court reasoned that Idaho law allows a person to procure a life insurance policy that benefits another, even if that individual does not have an insurable interest in the insured. Further, the district court held that even if there were an insurable interest requirement, whether that requirement is met would be reviewed at the time that the contract was made; here, Colafranceschi clearly had an insurable interest in Neustadt's life at the time the insurance policy was procured due to his marriage to her.

Additionally, the district court held that Colafranceschi's claim that he was coerced into withdrawing his divorce on the grounds of extreme cruelty was moot. This was because Colafranceschi was permitted, under the parties' stipulation, to proceed on his extreme cruelty claim on remand following the reversal of the decision regarding the Insurance Clause. However, the district court noted that the record appeared to be absent of any coercion.

---

[3] The opinion was amended in order to address Idaho Code section 15-2-804 in the context of the Insurance Clause, which was only brought to the district court's attention (through judicial research unrelated to the case) after the original opinion was issued.

The district court also affirmed the magistrate court's finding that Colafranceschi had not been fraudulently induced into signing the Premarital Agreement, nor had he been fraudulently induced to return to the Osprey house. Finally, the district court vacated the award of attorney fees because the district court had reversed the Insurance Clause decision. The district court instructed the magistrate court to reconsider who was the prevailing party following reversal of the Insurance Clause issue.

Neustadt timely appealed, arguing that the district court erred in concluding that the Insurance Clause was not void as against public policy. Colafranceschi filed a timely cross-appeal, asserting error in (1) the magistrate court's denial of a discovery request, (2) the lower courts' failure to address his objection to Neustadt's motion in limine, and (3) the lower courts' findings that Colafranceschi failed to prove he was fraudulently induced to sign the Premarital Agreement.

## II. STANDARD OF REVIEW

When this Court reviews the decision of a district court sitting in its appellate capacity, the standard of review is as follows:

> The Supreme Court reviews the [magistrate court's] record to determine whether there is substantial and competent evidence to support the magistrate's findings of fact and whether the magistrate's conclusions of law follow from those findings. If those findings are so supported and the conclusions follow therefrom and if the district court affirmed the magistrate's decision, we affirm the district court's decision as a matter of procedure.

> Thus, this Court does not review the decision of the magistrate court. "Rather, we are 'procedurally bound to affirm or reverse the decisions of the district court.'"

*Papin v. Papin*, 166 Idaho 9, 18, 454 P.3d 1092, 1101 (2019) (internal citations omitted) (quoting *Pelayo v. Pelayo*, 154 Idaho 855, 858–59 303 P.3d 214, 217–18 (2013)). "Accordingly, we will review the district court's decision to determine whether it correctly addressed the issues raised on appeal." *Id.*

"Substantial and competent evidence is relevant evidence that a reasonable mind might accept to support a conclusion." *Nw. Farm Credit Servs., FLCA v. Lake Cascade Airpark, LLC*, 156 Idaho 758, 763, 331 P.3d 500, 505 (2014) (quoting *Jarvis v. Rexburg Nursing Ctr.*, 136 Idaho 579, 583, 38 P.3d 617, 621 (2001)). "Findings of fact that are supported by substantial and competent evidence are not clearly erroneous—even in the face of conflicting evidence in the record." *Woods v. Woods*, 163 Idaho 904, 907, 422 P.3d 1110, 1113 (2018) (quoting *Hull v. Giesler*, 163 Idaho 247, 250, 409 P.3d 827, 830 (2018)).

5

"*Pro se* litigants are held to the same standards and rules as those represented by an attorney." *Suitts v. Nix*, 141 Idaho 706, 709, 117 P.3d 120, 123 (2005) (quoting *Twin Falls Cty. v. Coates*, 139 Idaho 442, 445, 80 P.3d 1043, 1046 (2003)).

### III. ANALYSIS

**A.     The Insurance Clause is not void as against public policy.**

Neustadt filed a motion in limine, seeking a ruling that Section 4.8 of the Premarital Agreement (the Insurance Clause) was void as against public policy. The Insurance Clause provides:

> (a) Wife must apply for 30-year term life insurance in the minimum amount of $2,000,000 within 30 days of the Effective Date of this Agreement. When the policy is issued it must name Husband as the sole beneficiary.

> (b) Wife must keep the policy in force after termination of the marriage unless Wife obtains a divorce from Husband under Idaho Code Section 32-603(1) through 32-603(7).

Neustadt argued that after divorce, the clause was void and unenforceable because it is a "wagering contract" and directly conflicts with the requirement set out in Idaho Code section 41-1804 that an individual have an "insurable interest" in the life insured. Neustadt contended that after divorce, Colafranceschi no longer had an insurable interest in Neustadt's life.

The magistrate court agreed with Neustadt, holding that the Insurance Clause was void as against public policy and unenforceable. The magistrate court concluded that, post-divorce, Colafranceschi lacked an insurable interest in Neustadt's life, as she would owe neither alimony nor child support to Colafranceschi, making insuring her life for his benefit akin to a wager on her death.

Following the divorce trial, Colafranceschi appealed from the magistrate court's decision. Acting in its appellate capacity, the district court reversed the decision of the magistrate court. The district court stated that "Idaho law allows Neustadt to do exactly what she committed herself, in the Insurance Clause, to do." First, the district court noted that Idaho Code section 41-1804(1) allows an individual to procure an insurance policy for the benefit of *any* person, with no requirement that the other person have an insurable interest in her life. The district court concluded that "[b]y agreeing to the Insurance Clause, Neustadt merely committed herself to a particular exercise of her right under section 41-1804(1) to insure her own life for the benefit of someone else."

6

The district court went further to conclude that had the life insurance policy "been purchased by Colafranceschi instead of by Neustadt, it would still have been valid after divorce." The district court noted that "anyone may purchase an insurance contract on someone else's life for the purchaser's own benefit, so long as the purchaser had, '*at the time when such contract was made*, an insurable interest in the individual insured.'" (italics in original) (quoting I.C. § 41-1804(1)). It was undisputed that during the marriage Colafranceschi had an insurable interest in Neustadt's life. *See* I.C. § 41-1804(3)(a) (providing that when persons are "related closely by blood or by law, a substantial interest engendered by love and affection" is an insurable interest).

Finally, the district court cited to a portion of the Uniform Probate Code. The district court concluded that Idaho Code section 15-2-804 provided a general rule that a divorce "[r]evokes any revocable . . . [d]isposition or appointment of property made by a divorced individual to his or her former spouse." (quoting I.C. § 15-2-804(b)(1)(i)). After reviewing the statutory definitions, the district court held that under this general rule, a divorce automatically revokes one spouse's designation of the other as a life-insurance beneficiary. However, the district court quoted that this general rule did not apply if "the express terms of . . . a contract relating to the division of the marital estate made between the divorced individuals before or after the marriage" provide for a beneficiary designation to survive divorce.

In its conclusion, the district court found that the Insurance Clause did not offend any public policy established by Idaho's "statutes, judicial decisions or the constitution[.]" Rather, Idaho Code sections 41-1804 and 15-2-804 expressly "allow agreements like the one Neustadt and Colafranceschi made by agreeing to the Insurance Clause[.]"

1. The Insurance Clause is not void as against public policy because Idaho law allows an individual to contract in this manner.

"Whether an insurance contract violates public policy presents a question of law for this Court to resolve." *Eastman v. Farmers Ins. Co.,* 164 Idaho 10, 14, 423 P.3d 431, 435 (2018) (quoting *Quiring v. Quiring*, 130 Idaho 560, 566, 944 P.2d 695, 701 (1997)). "The 'liberty of contract is not an absolute and unlimited right, but upon the contrary is always subservient to the public welfare.'" *Hill v. Am. Family Mut. Ins. Co.*, 150 Idaho 619, 623, 249 P.3d 812, 816 (2011) (quoting *J.F. v. D.B.*, 879 N.E.2d 740, 741 (Ohio 2007)).

> "[T]he courts will not hesitate to declare void as against public policy contractual provisions which clearly tend to the injury of the public in some way." 17A C.J.S. *Contracts* § 218 (2010). "The usual test applied by courts in determining whether a contract offends public policy and is antagonistic to the public interest is whether

the contract has a *tendency* toward such an evil." *Stearns v. Williams*, 72 Idaho 276, 283, 240 P.2d 833, 837 (1952) (emphasis added). "Public policy may be found and set forth in the statutes, judicial decisions or the constitution." *Bakker v. Thunder Spring–Wareham, L.L.C.*, 141 Idaho 185, 189, 108 P.3d 332, 336 (2005). Whether an insurance contract is against public policy "is to be determined from all the facts and circumstances of each case." *Foremost Ins. Co. v. Putzier*, 100 Idaho 883, 887, 606 P.2d 987, 991 (1980). In addition, "analogous cases involving the same general principles may be looked to by the court in arriving at a satisfactory conclusion." *Smith v. Idaho Hosp. Serv.*, 89 Idaho 499, 504, 406 P.2d 696, 699 (1965).

*Hill*, 150 Idaho at 623, 249 P.3d at 816.

The crux of this appeal is the public policy concerns surrounding the requirement of an insurable interest. "The purpose of the insurable interest doctrine is to prevent parties from insuring wagering or gambling." *Rhead v. Hartford Ins. Co. of the Midwest*, 135 Idaho 446, 451, 19 P.3d 760, 765 (2001) (citing *Nelson v. New Hampshire Fire Ins. Co.*, 263 F.2d 586, 590 (9th Cir. 1959)).

Notably, Idaho case law and its Constitution are silent regarding the public policy surrounding insurable interests in life insurance policies. However, this Court may look to statutes for established public policy. *Hill*, 150 Idaho at 623, 249 P.3d at 816. Idaho Code section 41-1804 describes the requirement of an insurable interest. That statute provides,

> [a]ny individual of competent legal capacity may procure or effect an insurance contract upon his own life or body for the benefit of any person. But . . . no person shall procure or cause to be procured any insurance contract upon the life or body of another individual unless the benefits under such contract are payable to . . . a person having, at the time when such contract was made, an insurable interest[4] in the individual insured.

I.C. § 41-1804(1).

---

[4] Idaho Code section 41-1804(3) sets out what constitutes an "insurable interest." That statute reads as follows:

> A person has an insurable interest in another person in the following cases:

> (a) In the case of individuals related closely by blood or by law, a substantial interest engendered by love and affection;

> (b) In the case of other persons, a lawful and substantial economic interest in having the life, health, or bodily safety of the individual insured continue, as distinguished from an interest which would arise only by, or would be enhanced in value by, the death, disablement or injury of the individual insured; and

> (c) An individual heretofore or hereafter party to a contract or option for the purchase or sale of an interest in a business partnership or firm, or of shares of stock of a closed corporation or of an interest in such shares, has an insurable interest in the life of each individual party to such contract and for the purposes of such contract only, in addition to any insurable interest which may otherwise exist as to the life of such individual.

I.C. § 41-1804(3).

A plain reading of Idaho Code section 41-1804 describes two types of insurance contracts. The first type is an insurance contract that is procured by the insured. For those insurance contracts, "[a]ny individual of competent legal capacity may procure or effect an insurance contract upon his own life or body for the benefit of any person." I.C. § 41-1804. Importantly, under this first type of insurance contract there is no mention made that the *beneficiary* must have an insurable interest in the insured's life. *See id.* The second type of insurance contract is one that is procured by another person on the life of the insured. The statute provides that "no person shall procure or cause to be procured any insurance contract upon the life or body of another individual" unless that person had an insurable interest in the life of the individual insured at the time the contract was created. I.C. § 41-1804(1).

Here, the Insurance Clause requires Neustadt to procure an insurance policy that benefits Colafranceschi; accordingly, the insurance policy at issue on appeal fits within the first type of insurance contracts recognized in Idaho Code section 41-1804.

One aspect of this appeal presents the issue of whether an individual may insure her own life for the benefit of another who lacks an insurable interest in the insured's life. As noted above, Idaho Code section 41-1804(1) does not require an insurable interest where the insured procures her own life insurance policy for the benefit of another. This appears to be the prevailing rule.

> The prevailing, although not the universal, rule is that in the absence of a statute to the contrary, a person competent to contract has an insurable interest in his or her own life and may insure his or her life for the benefit of another, who has no insurable interest, without contravening public policy.

3 *Couch on Ins.* § 41:22 (footnote omitted); *see also* Peter Nash Swisher, *Wagering on the Lives of Strangers: The Insurable Interest Requirement in the Life Insurance Secondary Market*, 50 TORT TRIAL & INS. PRAC. L.J. 703, 710–11 (2015) (collecting cases noting that an individual has an insurable interest in their own life).[5]

---

[5] *See, e.g.*, *Mutual Sav. Life Ins. Co. v. Noah*, 282 So. 2d 271, 273 (Alaska 1973) (noting that "a person has an unlimited insurable interest in his own life"); *Roundtree v. Frazee*, 209 So. 2d 424, 436 (Alaska 1968) (holding that an insurable interest is not necessary to be an eligible beneficiary); *Dodson v. Dodson*, 825 S.W. 608, 611 (Ark. Ct. App. 1992) (similar holding); *Hoffman v. Fed. Reserve Life Ins. Co.*, 255 P. 980, 981 (Kan. 1927) (stating that an "insured has an unlimited insurable interest in his own life"); *Am. Cas. Co. v. Rose*, 340 F.2d 469, 471 (10th Cir. 1964) (applying Ohio law) (holding that the plaintiff had an insurable interest in his own life and was free to "name anyone he saw fit as beneficiary, regardless of whether the beneficiary had an insurable interest in the insured"); *Pittsburgh Underwriters v. Mut. Life Ins. Co. of N.Y.*, 27 A.2d 278, 280 (Pa. Super. Ct. 1942) ("It is elementary that everyone has an unlimited insurable interest in his own life."); *Smith v. Coleman*, 35 S.E.2d 107, 111 (Va. 1945) (similar holding).

Neustadt stresses that other jurisdictions have concluded that it is necessary that a beneficiary must have insurable interest in order for a life insurance policy to be valid. While it is true that a few jurisdictions have held this,[6] all of the cases cited by Neustadt address the situation in which the *beneficiary* (who did not have an insurable interest) procured a life insurance policy on someone else's life. *See, e.g.*, *Lakin v. Postal Life & Cas. Ins. Co.*, 316 S.W.2d 542, 549 (Mo. 1958) (citation omitted) ("A person cannot take out a valid and enforcable [sic] policy of insurance for his own benefit on the life of a person in which he has no insurable interest[.]"); *Liss v. Liss*, 937 So. 2d 760, 762 (Fla. Dist. Ct. App. 2006) (invalidating a provision of a divorce settlement agreement that allowed an ex-wife to maintain a policy insuring her ex-husband's life); *Browning v. Browning*, 621 S.E.2d 389, 395 (S.C. Ct. App. 2005) (same). However, one scholar has observed that even those jurisdictions that have required that a beneficiary have an insurable interest, courts have carved out numerous exceptions to that rule. 3 *Couch on Ins.* § 41:23. The treatise notes that these carved out exceptions "highlight[ ] the argument that the minority rule does not actually represent public policy and is of minimal practical value." *Id.*

Here, the district court did not err in reversing the magistrate court's decision regarding the Insurance Clause. Idaho allows an individual to "procure or effect an insurance contract upon his own life or body for the benefit of any person." I.C. § 41-1804. There is no requirement in the statute that the beneficiary selected by the insured have an "insurable interest" in the insured's life. *See id.* Furthermore, this is the prevailing rule among the jurisdictions and scholars. As the district court noted, "[b]y agreeing to the Insurance Clause, Neustadt merely committed herself to a particular exercise of her right under section 41-1804(1) to insure her own life for the benefit of someone else."

Moreover, even outside the context of Idaho Code section 41-1804, it is difficult to conclude that the life insurance policy in this case is a "wagering contract," which is generally recognized as violating public policy. *See Rhead*, 135 Idaho at 451, 19 P.3d at 765. Wagering contracts are not well-defined in Idaho or elsewhere for that matter. However, a wager is defined as "something (such as a sum of money) risked on an uncertain event[.]" Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/wager. The Insurance Clause

---

[6] *See, e.g.*, *Webber v. Western & Southern Life Ins. Co.*, 220 S.W.2d 584 (Ky. 1949) (holding that a beneficiary must have an insurable interest in the life insured, even if named the beneficiary by the insured).

10

here is not a wagering contract because Colafranceschi does not pay the policy's premiums. Consequently, he is not placing any wager or gamble on Neustadt's life.

Neustadt argues that even though Colafranceschi is not making the premium payments himself, "he is forcing [Neustadt] to make those payments via the Premarital Agreement. Therefore, there is a wager on [Neustadt's] life, and she is the one being forced to pay for the wager that benefits only [Colafranceschi]." This argument seems founded in the following language from Idaho Code section 41-1804: "[N]o person shall procure *or cause to be procured* any insurance contract upon the life or body of another individual unless" the party has an insurable interest in the insured's life. I.C. § 41-1804 (italics added). The italicized language is not applicable here because the record demonstrates that Neustadt voluntarily agreed to the Premarital Agreement—in fact, she is the party who primarily benefits by keeping her assets separate from Colafranceschi's. Both parties signed the agreement. Both parties had attorneys. Both attorneys signed the agreement, certifying that they had advised their clients of their rights with respect to the Premarital Agreement. Accordingly, Neustadt was not "forced" to contract to procure a life insurance policy.

Notably, one of the valid concerns regarding a "wagering contract" in a life insurance policy is the possibility that the beneficiary might resort to homicide in order to benefit from the life insurance policy, especially when the beneficiary has no pecuniary benefit in the person staying alive. However, this concern is mitigated by Idaho's slayer rule. Under Idaho Code section 15-2-803(j)(1), if a life-insurance beneficiary murders the insured, the beneficiary is appropriately precluded from collecting the insurance proceeds. I.C. § 15-2-803(j)(1). Further, in this case, the Insurance Clause provides that Neustadt would be relieved from her obligation to continue the life insurance policy if she were to prove divorce on the grounds of extreme cruelty or habitual intemperance—grounds which would make the likelihood of homicide more likely.

Even if the insurable interest requirement were applicable in this case, courts measure the existence of an insurable interest "at the time when such contract was made[.]" I.C. § 41-1804(1). It is undisputed that during the marriage, Colafranceschi had an insurable interest in Neustadt's life. I.C. § 41-1804(3)(a) (providing that persons related by law have an insurable interest). Because the insurance policy was purchased during the marriage, at which time Colafranceschi had an insurable interest, the Insurance Clause was valid.

11

We do not find it necessary to address the district court's decision regarding Idaho Code section 15-2-804. We find that Idaho Code section 41-1804 sufficiently answers whether the Insurance Clause is violative of public policy.

In conclusion, the district court did not err in holding that the Insurance Clause was not void as against public policy. Idaho Code section 41-1804 specifically allows Neustadt to procure a life insurance policy for the benefit of anyone she chooses. The Insurance Clause merely contractually obligates Neustadt to procure a life insurance policy she is allowed to obtain under Idaho law. Additionally, the Insurance Clause does not constitute a wagering contract because Colafranceschi is not making any payments that would be akin to wagering or gambling on Neustadt's life. Accordingly, nothing in Idaho's "statutes, judicial decisions or . . . constitution" establish that the Insurance Clause should be void as a matter of public policy. *Hill*, 150 Idaho at 623, 249 P.3d at 816 (quotation omitted). Consequently, we affirm the district court's decision to reverse the magistrate court.

2. <u>The district court's vacation of attorney fees is affirmed.</u>

Neustadt requests that this Court reverse the district court's decision regarding the Insurance Clause and reinstate the award of attorney fees. The district court vacated the award of attorney fees because it determined that the magistrate court's award was primarily due to Neustadt prevailing on the Insurance Clause issue.

Section 22 of the Premarital Agreement provides for attorney fees to the prevailing party regarding the enforcement of the Premarital Agreement. Here, Neustadt is not the prevailing party because Colafranceschi prevailed regarding the enforceability of the Insurance Clause. Therefore, the district court's vacation of attorney fees is affirmed.

3. <u>As Colafranceschi has succeeded on appeal regarding the enforceability of the Insurance Clause, we do not need to address his objection to Neustadt's motion in limine.</u>

Colafranceschi raises as one of his issues in his cross-appeal that the magistrate court committed error by failing to address his objection to the motion in limine regarding the enforceability of the Insurance Clause. The issue regarding the motion in limine is moot. There is no need to address a procedural defect in the motion as Colafranceschi has succeeded on the substantive issue in the motion, resulting in the enforceability of the Insurance Clause.

**B.    Colafranceschi forfeited the issue regarding discovery.**

On appeal, Colafranceschi argues that the magistrate court erred regarding certain denials of his discovery requests. However, Colafranceschi does not point to a single discovery request he suggests that the magistrate court should have allowed but did not. He fails to cite to any specific order from the magistrate court in which the magistrate court denied his discovery requests.

This Court "will not consider an issue not 'supported by argument and authority in the opening brief.'" *Bach v. Bagley*, 148 Idaho 784, 790, 229 P.3d 1146, 1152 (2010) (quoting *Jorgensen v. Coppedge*, 145 Idaho 524, 528, 181 P.3d 450, 454 (2008)); *see also* I.A.R. 35(a)(6) ("The argument shall contain the contentions of the appellant with respect to the issues presented on appeal, the reasons therefor, with citations to authorities, statutes and parts of the transcript and the record relied upon."). "Regardless of whether an issue is explicitly set forth in the party's brief as one of the issues on appeal, if the issue is only mentioned in passing and not supported by any cogent argument or authority, it cannot be considered by this Court." *Bach*, 148 Idaho at 790, 229 P.3d at 1152 (citation omitted). Additionally, "[t]his Court will not search the record on appeal for error." *Id.* (citing *Suits v. Idaho Bd. of Prof'l Discipline*, 138 Idaho 397, 400, 64 P.3d 323, 326 (2003)).

It is Colafranceschi's burden to point this Court to the alleged error. As noted, this Court will not search the record for error. Additionally, he provides no legal argument regarding any abuse of discretion. He merely cites to I.R.C.P. 36, which allows for discovery. Because Colafranceschi failed to provide cogent argument and authority, or point this Court to any alleged error in the record in his opening brief, Colafranceschi has forfeited any argument regarding a discovery issue. Accordingly, this Court will not address that issue further.

**C.    The magistrate court did not coerce Colafranceschi into withdrawing his extreme cruelty claim.**

Here, Colafranceschi and Neustadt both sought a divorce based on the other's alleged extreme cruelty. However, as trial neared, the parties stipulated with the magistrate court's approval that neither would proceed on an extreme cruelty claim at trial. However, the parties also agreed that if Colafranceschi were to succeed on appeal regarding the Insurance Clause and the case were remanded, both parties would have the right to pursue their extreme cruelty claims.

The district court held that because it was reversing the magistrate court's decision regarding the Insurance Clause, Colafranceschi may, under the parties' stipulation, proceed on his extreme cruelty claim on remand.

Although not explicitly stated as an issue on appeal, Colafranceschi appears to contend that he was coerced into withdrawing his extreme cruelty claim. The district court noted that the issue was moot because it was remanding the case and, according to the parties' stipulation, Colafranceschi could pursue his extreme cruelty claim. Further, the district court held that there was an absence of coercion in the record.

It appears that Colafranceschi's claim of coercion arises from certain statements made by the magistrate court throughout the proceedings. For example, there were several times that the magistrate noted that Colafranceschi's extreme cruelty claim, even if successful, might not get him anything: "Issues of extreme cruelty would certainly be relevant if there were children involved. So that gets you nothing that I can see"; "But how does [proving extreme cruelty] benefit you?"; "I'm not sure what you have to gain from going into mental cruelty"; "I don't see how extreme cruelty helps Mr. Colafranceschi at all. If you want to spend two days trying to prove divorce on the grounds of extreme cruelty, that's likely a waste of his time . . . . It gets him nothing."

These comments by the magistrate court do not rise to the level of coercion. Rather, the statements appear to question whether taking the time to prove an extreme cruelty claim would gain Colafranceschi anything. A review of the record demonstrates that the magistrate court gave Colafranceschi the option to either withdraw his extreme cruelty claim or to continue to pursue it. Colafranceschi agreed to withdraw his claim pursuant to the stipulation by the parties. There is nothing in the record to indicate that the magistrate court's conduct was coercive or otherwise improper.

Accordingly, this Court affirms the district court's decision that Colafranceschi was not coerced into dropping his extreme cruelty claim. This conclusion is made in light of the fact that Colafranceschi may now pursue the extreme cruelty claim on remand due to our decision that the Insurance Clause does not violate public policy.

**D.** **There is substantial and competent evidence to support the magistrate court's conclusion on Colafranceschi's claims of fraudulent inducement regarding equity in the Osprey house.**

Colafranceschi claimed that Neustadt fraudulently induced him to take certain actions by promising him equity in the Osprey house. First, Colafranceschi claims that Neustadt fraudulently induced him to sign the Premarital Agreement. Second, Colafranceschi claims that Neustadt fraudulently induced him to return to the Osprey house after he and Neustadt had separated. Each claim will be addressed in turn.

14

1. The law surrounding fraud.

Under Idaho law, fraud consists of nine elements. A plaintiff must prove each element by clear and convincing evidence. *Doe v. Boy Scouts of Am.*, 159 Idaho 103, 108, 356 P.3d 1049, 1054 (2015). Those elements are:

(1) a statement or a representation of fact; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity; (5) the speaker's intent that there be reliance; (6) the hearer's ignorance of the falsity of the statement; (7) reliance by the hearer; (8) justifiable reliance; and (9) resultant injury.

*Id.* (quoting *Glaze v. Deffenbaugh*, 144 Idaho 829, 833, 172 P.3d 1104, 1108 (2007)). "Clear and convincing evidence is evidence that indicates the thing to be proved is highly probable or reasonably certain." *In re Doe*, 157 Idaho 694, 699, 339 P.3d 755, 760 (2014) (citation omitted).

2. Substantial and competent evidence supports the magistrate court's decision that Colafranceschi was not fraudulently induced to sign the Premarital Agreement.

Colafranceschi claimed that Neustadt promised him he would have equity in homes that were purchased during the marriage. Neustadt denies that she made any promises as to her separate property. Colafranceschi claims that he would not have signed the Premarital Agreement if he had believed that he would not have a community property interest in any future homes the couple purchased.

The parties' Premarital Agreement provides that

[a]ny income derived from the parties' community property, any property derived from the sale or exchange of community property, any acquisition, right, or profit received or accruing from community property, is the community property of husband and wife.

This language recognized that the parties may acquire community property.

Although the magistrate court did not expressly identify which element of fraud Colafranceschi failed to prove, the magistrate court found that the Premarital Agreement included no promise as to community property in any home. The magistrate court also found that even if Neustadt had made an unwritten promise about marital homes being considered community property, such a promise extended only to homes the couple purchased *together*; therefore, the promise did not extend to the Osprey house, which was instead purchased by Neustadt's Trust. The district court affirmed the magistrate court's findings as supported by substantial and competent evidence. The district court relied on certain statements made by Neustadt during the trial and the language of the Premarital Agreement itself.

15

On appeal to this Court, Colafranceschi appears to argue that the magistrate court failed to recognize that Neustadt had promised him equity in the home, citing to his numerous emails and assertions during trial. Colafranceschi also contends that the magistrate court failed to consider comments by Neustadt that she intended to leave Colafranceschi with nothing following divorce. Additionally, Colafranceschi argues that he made it clear that he only intended to sign the Premarital Agreement if he were to get an interest in any home they purchased together.

In response, Neustadt argues that she testified several times during the trial that she never promised Colafranceschi an interest in any future marital home. Further, Neustadt contends that the plain language of the Premarital Agreement shows that anything purchased by her alone or with her interest in the Trust would be separate property. Also, Neustadt asserts that the language of the Premarital Agreement supports the conclusion that Colafranceschi was not fraudulently induced.

Substantial and competent evidence supports the magistrate court's decision. First, there are multiple statements by Neustadt that she never promised Colafranceschi any interest in homes purchased by her. Accordingly, the record supports the finding that Colafranceschi failed to prove that Neustadt made a false statement regarding any equity in a marital home prior to entering into the Premarital Agreement. Even if there are conflicting statements by Colafranceschi, "[f]indings of fact that are supported by substantial and competent evidence are not clearly erroneous—even in the face of conflicting evidence in the record." *Woods*, 163 Idaho at 907, 422 P.3d at 1113 (quotation omitted).

Further, the record supports that Neustadt and Colafranceschi did not buy the Osprey house together. Rather, the Osprey house was purchased by Neustadt's Trust. There is no evidence in the record that Colafranceschi requested that he and Neustadt buy the house together, nor is there evidence that Colafranceschi objected to the Trust purchasing the Osprey home.

Finally, language in the Premarital Agreement precludes any reliance on an oral promise from Neustadt. The Premarital Agreement's merger clause provides that the agreement "contains the entire agreement of the parties, and there has been no promise, representation, agreement, warranty, or undertaking by either party to, or relied upon by, the other, either oral or written, of any character or nature, except as set forth in this Agreement." Further, the Premarital Agreement provided that agreement could only be modified in writing. Therefore, even if Neustadt had made

16

an oral promise, it was not reasonable for Colafranceschi to rely on such a promise given the language of the Premarital Agreement.

It appears that Colafranceschi is mostly asking this Court to reweigh evidence that was presented to the magistrate court. However, "appellate courts in Idaho do not reweigh evidence." *Matter of Doe II*, 166 Idaho 47, 54, 454 P.3d 1130, 1137 (2019) (quoting *State v. Doe*, 144 Idaho 839, 842, 172 P.3d 1114, 1117 (2007)).

Accordingly, we affirm the district court's affirmation of the magistrate court's decision.

3. Substantial and competent evidence supports the magistrate court's conclusion that Colafranceschi was not fraudulently induced to return to the Osprey house.

Additionally, Colafranceschi claimed that, during a marital separation, Neustadt fraudulently induced him to return to the Osprey house by promising him equity in the home. The couple separated around December 27, 2015, and moved back in together on February 22, 2016. During this separation, Neustadt gave Colafranceschi $30,000. Many of the parties' arguments surrounded money. Colafranceschi argued that Neustadt financially abused him by controlling her money. Colafranceschi began recording their conversations. During one conversation, Colafranceschi stated he was only asking for half of the equity in the house. Further, Colafranceschi discussed that he wanted to "feel safe going back there," likely meaning the Osprey home.

Also during the separation, the parties met with Carol Griffith (Griffith), their marriage counselor. Colafranceschi also recorded this conversation. The conversation was mostly a discussion between Neustadt and Colafranceschi regarding his belief that he should be entitled to equity in the home.

On February 22, 2016, Colafranceschi moved back into the Osprey house. The next day, Colafranceschi emailed a written postnuptial agreement to Neustadt, requesting an interest in the Osprey home. Neustadt responded that her father and her attorney would have to review it. Colafranceschi notes in the emails that he would not have returned if she had not agreed to the items in the postnuptial agreement. Again, Colafranceschi recorded another conversation, in which Neustadt stated that she would not sign the agreement, and that her father would not agree to it either.

The magistrate court found that the parties negotiated toward such an agreement but never reached one, negating the first element of fraudulent inducement. Further, the magistrate court

17

found that even if Neustadt had made the oral promise, it would have been unreasonable for Colafranceschi to rely on it, partly because he knew any such agreement had to be in writing.

The district court affirmed the magistrate court's findings. The district court noted that Neustadt testified that she did not sign any amendments to the Premarital Agreement. Further, the district court noted that the Premarital Agreement could not be modified orally. Colafranceschi presented a postnuptial agreement for Neustadt to sign, but she never signed it. In the end, Neustadt refused to sign anything changing the status of the Osprey house.

On appeal to this Court, Colafranceschi again argues that the magistrate court failed to properly consider emails between him and Neustadt demonstrating that Neustadt intended to sign the postnuptial agreement. Colafranceschi also points to a conversation he had with Griffith, the marriage counselor, in which he stated that he would not have moved back if he would have known that Neustadt would not sign the agreement.

In response, Neustadt argues that Colafranceschi was not fraudulently induced to return to the Osprey house because he was aware that in order to modify the Premarital Agreement, there had to be a writing signed by Neustadt and her attorneys. Neustadt points to an acknowledgement by Colafranceschi that he wanted her to sign the postnuptial agreement because he was aware that any change needed to be in writing. Accordingly, Neustadt contends, Colafranceschi was not entitled to rely on any promise made by her.

Here, the district court did not err in affirming the magistrate court's decision. The record demonstrates that during the separation, the parties were negotiating a potential interest in the Osprey house. However, Neustadt refused to sign any amendments. She also testified that she never agreed to give Colafranceschi equity in the home. While Colafranceschi notes that Neustadt stated several times that she could not be positive that she never made such an oral promise, this conflicting evidence is not enough to overturn the magistrate court's finding that negotiations occurred without the parties ever reaching a satisfactory agreement. *See Woods*, 163 Idaho at 907, 422 P.3d at 1113 (quotation omitted).

Further, as found by the magistrate court, Colafranceschi did not have the right to rely on any promise from Neustadt; accordingly, the eighth element of fraud was not proven. Colafranceschi was aware that the Premarital Agreement could not be modified orally, and had to be modified in writing. I.C. § 32-924 (requiring amendments to be in writing). The record demonstrates that Colafranceschi was aware of the need for the agreement to be in writing when

18

he emailed Neustadt the proposed postnuptial agreement. Again, it appears that Colafranceschi is mostly asking this Court to reweigh evidence that was presented to the magistrate court. However, "appellate courts in Idaho do not reweigh evidence." *Matter of Doe II*, 166 Idaho at 54, 454 P.3d at 1137 (2019) (quotation omitted).

Accordingly, the magistrate court's decision is supported by substantial and competent evidence. Therefore, the district court did not err in affirming the magistrate court's decision.

**E.      Neither party is entitled to attorney fees or costs on appeal.**

Preliminarily, Colafranceschi is not an attorney and therefore is not entitled to attorney fees, nor does he request any. *See Michalk v. Michalk*, 148 Idaho 224, 235, 220 P.3d 580, 591 (2009).

Neustadt requests attorney fees pursuant to Section 22 of the Premarital Agreement. Section 22 provides for attorney fees to the prevailing party if that party retains counsel for the purposes of enforcing the Premarital Agreement or for a declaration of his or her rights under the Agreement.

Here, neither party is the prevailing party. Colafranceschi prevailed on Neustadt's appeal, but Neustadt prevailed on Colafranceschi's appeal. Accordingly, neither party is the prevailing party, and neither party is entitled to attorney fees on appeal. *See Campbell v. Kvamme*, 155 Idaho 692, 697, 316 P.3d 104, 109 (2013).

### IV.  CONCLUSION

For the foregoing reasons, we affirm the district court's decision in its entirety. First, the Insurance Clause is not void as against public policy. Second, any error regarding discovery has been forfeited. Third, there is no evidence that the magistrate court coerced Colafranceschi into withdrawing his extreme cruelty claim. Finally, substantial and competent evidence supports the magistrate court's conclusions that Colafranceschi was not fraudulently induced regarding equity in the Osprey home. Attorney fees and costs are not awarded to either party.

Chief Justice BURDICK, Justices BRODY, BEVAN and MOELLER CONCUR.